May I please the Court. Good morning, Your Honors. My name is Susan Hill and I represent the Petitioner, Mr. Garcia. Your Honors, substantial evidence shows that Mr. Garcia did not commit acts of smuggling as defined by the Act, and moreover, he did not lie about what had occurred, either what had occurred at the time and he did not have inconsistent testimony between the two different court hearings. By the plain language of the smuggling statute at issue, which is INA section 212A6E or codified at 8 U.S.C. section 1182, the plain language limits application of that statute to conduct that occurred before the entry was made of the person who allegedly was smuggled into the country. Now, in Mr. Garcia's case, the judge limited his findings to a timeline. In fact, the judge made specific findings that Mr. Garcia had said that he would be glad to pay the brother-in-law back. The brother-in-law is the person who loaned his wife money to smuggle her in. The judge also said there was an understanding of a loan that was agreed to before the smuggling occurred. And finally, the judge said that Mr. Garcia had told his wife not to worry and that if the brother helped her, he would repay the money to get her in. None of these words were ever uttered by Mr. Garcia in the record. And the judge did not specifically quote Mr. Garcia's words. The judge didn't point to any instances in the testimony. Roberts. Why don't we just turn to what he said at the first hearing, which is the genesis of most of all of this, where at the end of the colloquy. She she went back to Mexico. Right. And there was there was there for two months. Goes on. She called you. And then he says. And I told her that I didn't have the means, the money to pay for that. Then there and then. And she left. And her brother, she would ask. She would ask to borrow money from her brother. And I said, well, OK, I'll pay him back when I get the money. Yes. And then the I.J. takes a break and says, you know, he asked some questions about that and says, you know, oh, there's problems here. Lawyers better think this out, you know, because you just look like you're assisting her in illegal reentry into the country. So then there's a break for a couple of months. They come back and he has his story somewhat refined. Somewhat refined. Yes, Your Honor. What what led up to that colloquy, the judge asked a very general question. And as a fact finder, it's his responsibility to ensure that the hearing is conducted fairly and that all the evidence is put forth. As I stated, the statute limits is limited to conduct that occurred before the entry. When the judge asked his question, he did not indicate that he was looking for a specific timeline. He simply said, tell me what happened. Mr. Garcia started off with, well, she had called me. She said this. I said that. And then the only the only portion that the judge perhaps relied on was that single response to that very broad question. And in that response that Mr. Garcia gave, he did say, she called me. We had this exchange. Then he said, and she left. And then he continued on explaining the whole entire incident. The answer itself does not give any sort of time frame to it. It has no indication as to when. So what you're saying is that the I.J. should have construed that statement. And I said, oh, well, OK, I'll pay him back when I get the money. But that occurred after she reentered? Which occurred after? That statement. That I said, oh, well, OK, I'll pay him back when I get the money. Yes, because as Mr. Garcia was telling the whole story, what happened, and he was not giving any indication that the judge was only interested in what occurred prior to Sonia's entry, the judge just said, what happened? So Mr. Garcia said, she called me. I didn't have the money. She went and borrowed it from her brother. I said, I'll pay it back. It all came out in a jumble. He was not given any warning. He was not given any direction. Oftentimes, I'm sure this Court's seen in transcripts, the people that testify are nervous. They don't limit their answers to a very logical progression of events. Well, under the law, does it make a difference whether he intended to pay the brother back before she came across with the smuggler or he decided to do that after? What does that make a difference under the alien smuggling statute? Well, the judge is indicating that his promise to pay the brother back somehow assisted or induced his wife to enter the United States. We would argue that he did not make that promise before her entry. Of course, once she has entered the United States, the statute doesn't apply because you cannot encourage, induce, assist, so on and so forth, someone to enter the United States after they have entered. There are separate statutes that do address what a person does to continue another person's illegal presence in the United States, but this statute does not address those instances. The judge focused on that, and additionally, this fact pattern involves at the time she was his common-law wife, and then they soon married after the hearing. Let me ask you this. Was the I.J. required to view it, this passage, the way you just explained it to us? Well, substantial evidence shows that Mr. Garcia did not specifically state the words that the judge attributed to him. And in fact, it was that one single sentence, and then the rest of the testimony, which was over pages of the transcript, he repeatedly denied ever having stated those words, and he never did specifically state that he agreed to pay the brother back before his wife found the smuggler and before his wife talked to her brother. Now, was the I.J. required? It seems like what happened was that when he came back and he had a slightly he sort of offered a further explanation at that point, the I.J. said, well, you know, you've changed your story now, so now I don't believe you. Well, his testimony never was pinned down to begin with to be reliable enough to be used as perhaps impeachment evidence. As you did point out, Your Honor, as soon as that – it was a rather confusing statement – as soon as that did come out from Mr. Garcia, the judge did interrupt the testimony and said, let's look into this, let's come back in a few months. It's entirely possible that this would have been his testimony if the judge had pursued the issue that day. I don't think it's fair for the judge to accuse Mr. Garcia of having changed his testimony when he never had specific reliable testimony beforehand and just because the judge had an intervening continuance in the passage of a few months. Additionally – Well, counsel, you argue that this – well, the testimony put together isn't clear. Is that right? I mean the single statement that the judge seems to have relied upon, which was the telephone conversation, it was about – I think it was a single sentence, actually. Right. But do you say that doesn't make clear what really happened? I see that that does not clearly state when he agreed to pay the brother-in-law back, and it is not a clear statement of what happened for purposes of impeaching him later. Well, the problem is under the substantial evidence standard that you need to establish that the evidence compels a contrary reading. And if it's simply unclear, how can it compel a reading contrary to what the I.J. said it was? Because, Your Honor, in context with the rest of his testimony where he repeatedly denied having talked to the brother or having made that promise beforehand, and additionally, his wife testified that he did not make that promise to her. She's the one who spoke with the brother. So in context with the rest of the testimony, it does not – the evidence shows that he did not make that promise beforehand, and the judge is relying on one single sentence, which we do argue is confusing, but the evidence even surrounding that sentence shows that he did not utter those specific words that the judge attributed him with. May I reserve the rest of my time for rebuttal? Yes, you may. Thank you. I'm going to take two seconds to set up, Your Honor. Thank you. Thank you for your indulgence, Your Honor. Your Honors, good morning, and may it please the Court. My name is Jeffrey Bernstein, and I represent the Attorney General of the United States, and the Court is correct in stating that the first issue is whether the Petitioner has identified evidence compelling the conclusion that Mr. Garcia did not at any time knowingly encourage, assist, aid, or abet his then-girlfriend's illegal entry into the United States, and the answer is no, and all one need look at is that the evidence that Your Honors were discussing with the Petitioner's counsel – actually, there is a bit more evidence, some more evidence – I'm not going to quantify it by saying a bit, but there is more evidence than this particular paragraph that the Court and counsel were discussing. On page 120 of the administrative record, Mr. Garcia testified that his then-girlfriend called and said – called him and said that she was ready to come home from Mexico after she had spent two months there. And then at Petitioner's appendix page 2, the Petitioner testifies that his former girlfriend found a smuggler or someone to bring her over. Can you pay? Obviously, a smuggler. I believe he had admitted earlier that she was smuggled over by a smuggler. And then in response to that, he says, well, I can't pay at the moment. And she says – well, I'll actually read the passage. And I told her that I didn't have the means, the money to pay for that there and then. And she left. And her brother, she would ask to borrow money from her brother. And I said, well, okay, I'll pay him back when I get the money. See, that's – that is really not clear, because she left. I mean, it could be that then she left for Mexico and did the whole return on her own by borrowing money from her brother. Your Honor, if it's unclear, and I'm not saying that it is absolutely clear. I think in context it is fairly clear. But even if it's unclear, the question is whether or not there's evidence compelling the judge – compelling an inference opposite to the inference that the immigration judge drew that – and that inference was that during that conversation or perhaps even two conversations before she left, that he was on board with the agreement that she would borrow money from the brother and that he would pay her back. And that's supported by substantial evidence. There's absolutely no evidence compelling a contrary inference. With respect – But earlier testimony in that same hearing, the beginning of it, it's very clear when the immigration judge asked Garcia-Baez, did you have any involvement? No. Did anybody pay a smuggler? I think so. Was it her brother? But what was your involvement? Well, later on I sent him money, the money that he paid for. I mean, he's saying he had no involvement. It wasn't until later that – I mean, he just keeps being asked over and over, but what was your involvement? What was your involvement? And then this – he paid the money. That's clear. He did pay the brother back. But he clearly says he wasn't involved in getting her smuggled across. Well, his testimony evolved. His testimony evolved. He said, it's my recollection, that when asked by – on cross-examination – I believe this was all on cross-examination, or it might have been on direct. To be honest with you, I can't remember. I think the first part was direct. Yes. And he said that he did not pay, but then his testimony continually evolved. Was there a smuggler involved? I think he initially said no and then admitted later that there was a smuggler involved. So his testimony is continually evolving to the point where he essentially admits that, yes, there was an agreement, a smuggler was involved, there was disagreement because she called me on the telephone, told me she was ready to come home, and she needed the money to pay the smuggler, and that he didn't have the money. So she suggested, or someone suggested, that she get the money from the brother with the promise that it would be paid. I mean, the testimony – But you thought that the whole thing would turn around – I mean, would turn on whether he knew he was going to repay the brother before she came across or whether he just paid back the brother after she came home. Well, I'm not so sure that there's a difference in the law, Your Honor, because as we argue in our brief, his repayments after the fact was good enough to implicate the statute. Not – only if there was an agreement to repay, and it doesn't even seem from his testimony that he ever talked about – You know, prior agreements to repay? Right. Oh, I don't think so. I think the statute is incredibly broad. There's no evidence that Congress intended to limit the obstacle to suspension of deportation to situations where the aid, aiding, abetting, and assisting and or assisting occurred before. I think Congress's intention is clear that they wish to make – Did he have the intent beforehand? No. Not the intent beforehand. So just the fact that he paid her afterwards – He had to knowingly assist, aid or abet. Knowingly assist – He could have informed that intent after she reentered the country. Oh, sure. He knew – he knew – That's – Even if it is, as the Petitioner asserts, that his only knowledge was that he had to pay the brother back the smuggling money afterwards, that is assisting in the smuggling. He paid the money. It's assisting in the smuggling. And there's no indication that Congress meant to limit it to acts occurring beforehand. But even assuming that we're just talking about beforehand, and that's what the immigration judge found, that it all happened beforehand, he was entitled to draw that inference that he drew. And the Petitioner, again, concentrates in this paragraph on the random statement and she left, which is totally out of context. And – Well, it couldn't have been in the telephone call because he said she left, not she didn't – he didn't say she hung up. Well, that's a random comment, Your Honor. We don't know – And the other thing that the IJ relies on isn't random. I mean, this whole thing is kind of – Oh, I don't think it's random at all. He testified. She said – she called and said she was ready to come back. She told me that she found someone that could bring her back. Asked for the money. I told her I didn't have the means, the money to pay for that there and then. She asked her brother to borrow money. She said she was going to ask her brother to borrow money. And I said on the telephone, well, okay, I'll pay him back when I get the money. This and she left is just kind of a random three words in the middle of that and doesn't disturb the context of the fact that this was during a telephone conversation after she had told him she was ready to come back to the United States and she needed money to pay a smuggler. The immigration judge then was not simply relying, obviously, on his notes. He went back with the counsel and he listened to the tape. And after listening to the tape, after hearing Mr. Garcia's voice, the inflection in his voice, he maintained his original opinion of that testimony, that, in fact, beforehand, before she came over, he knew about the agreement and agreed to repay.  Okay. So suppose he, I mean, it's not that clear that she was for sure going to get the money from the brother, but suppose he has some awareness that she's going to get the money from somebody and she does get the money from somebody. And then she comes across the border, having paid the smuggler on her own, and says to her husband, you know, I want you to pay my brother back or this other third person back out of a moral obligation because he helped me. Does that mean that this petitioner falls within the statute? We're talking about nothing happening prior. We're talking about... Knowledge. Knowledge that she's planning on getting back here. For sure we don't know where the money will come from because there's nothing in here that says for sure it's coming from the brother. But she's going to do what she can to get back here. Turns out she gets the money from the brother. And three months later, he pays the brother back. Pure moral obligation. Well, even pure moral obligation, the statute is clear. I mean, based on the fact that the woman is his wife. The woman wasn't his wife three months later. Became his wife. Obviously, they had children together, so there was obviously a relationship that might establish some kind of ethical moral obligation. By paying the money, Your Honor, he aided, assisted, abetting the smuggling. So if he paid, whether it was under moral obligation or through, you know, a financial desire, it doesn't matter. As long as he knowingly aiding... Maybe he shouldn't have paid. Maybe he should have just kept the debt to his brother and then he'd be fine, under your theory. Well, I think perhaps, but I think he's caught up in the end. If it happened beforehand... If he hadn't paid, would he have been excluded under this waiver provision? If the agreement was entered into beforehand or if the discussion occurred beforehand, he certainly, and this is really an example of how broad the statute, he encouraged her. He encouraged her to be smuggled in. And because he wants his then-girlfriend wife to come home with his kid, that's encouragement. Well, the reasons are beside the point, but when she tells him... If I pick up the phone to someone in Mexico who's not a citizen of the United States, who's a friend or a relative, and say, gee, I'd really like you to come to the United States, this person says, I don't know how I'm going to do it, I don't know where I'm going to get the money, I don't know what I'm going to do. When they on their own get a smuggler, find money to pay, come across, I'm involved because I've encouraged them? That's not what happened here, Your Honor. No, I'm saying that's the logical extension of what your last argument was. I don't think so. All I am saying, Your Honor, is he had this – if he had this conversation, she said she's going to be smuggled in. And he does not discourage her. And he – that is essentially encouraging. That's sufficient, you're saying? Oh, I think it is. Under the statute? But that didn't happen here, obviously. Here... That's what I'm saying. You're arguing this is such an extreme, it undercuts your argument. Well, I don't think it's extreme, Your Honor, and I'm happy to back off if you want and concentrate on what happened here. Well, anyway, you're over time and we understand your argument. Thank you, Your Honor. So thank you. Your Honor, as this counsel pointed out, the judge did listen to the tape several times, and yet he still failed to pinpoint any testimony that supported his finding about either the lying or what actually occurred with the smuggling. And moreover, as you pointed out, Judge Wardlaw, the facts of this case, I think, are significant in that Sonia Armente had been living in the United States for a very long period of time. She made the decision on her own to return to her family and her children. Whether her husband helped to pay the money before she entered is irrelevant. And as pointed out in our brief, you could also argue the community property laws who had the right to incur this debt, and the community had the liability to pay it back. But this was not developed below in front of the judge. So perhaps this Court would want to remand for that. All right. Do you have anything else? All right. Thank you very much, counsel. The case of Garcia-Baez v. Alberto Gonzalez is submitted. And we now welcome the visiting judges from Afghanistan. And, Judge Nelson, there's plenty of seats up front. Why don't you have them come down and sit down? Well, thank you. Perhaps I should explain that Judge Hall suffered a back injury, and she is listening to this argument over her computer. And then she will participate in conference after the hearing. Thank you. Welcome. Enjoy your visit. Thank you. All right.
judges: Hall, Wardlaw, Paez